# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

NATHAN JONES, :
:
*Plaintiff*, :
: Case No. 1:20-cv-963
vs. :
: Judge Jeffery P. Hopkins
SUN CHEMICAL CORPORATION, :
:
*Defendant*. :

# OPINION & ORDER

Plaintiff Nathan Jones ("Jones" or "Plaintiff") worked as a temporary employee for Defendant Sun Chemical Corporation ("Sun Chemical") before he was terminated for underperforming at the end of his probationary period. He subsequently filed this lawsuit initially claiming that Sun Chemical discriminated against him because of race, forced him to work in a hostile work environment, and retaliated against him for lodging a discrimination complaint by terminating him in violation of 42 U.S.C. §§ 1981, 2000e-3, and Ohio Rev. Code Ann. § 4112.02. *See* Doc. 1. Plaintiff seeks compensatory damages for both his economic and non-economic injuries, along with liquidated and/or punitive damages and equitable relief in the form of reinstatement or front pay, and an award of his reasonable attorney's fees and costs for prosecuting this matter. Now pending are Sun Chemical's motion seeking summary judgment (Doc. 27), Plaintiff's response in opposition (Doc. 31), and Sun Chemical's reply (Doc. 35).

For the reasons that follow, the Court **GRANTS** Sun Chemical's Motion for Summary Judgment (Doc. 27) and **DISMISSES** Plaintiff's Complaint (Doc. 1) **WITH PREJUDICE**.

I.      BACKGROUND

Plaintiff is an African American male who was employed by Sun Chemical for four months, from April to August 2019, but never advanced beyond the status of probationary employee. Sun Chemical operates two production plants that manufacture printed inks, organic pigments, and coatings. Sun Chemical hired Plaintiff as a production technician in its Amelia, Ohio plant. Like all new-hires, Plaintiff was brought on as a probationary employee. Probationary employees are subject to a heavily scrutinized introductory period whereby Sun Chemical evaluates the candidates' progress every 30 days normally over a 90-day period to determine which new-hires demonstrate the skills necessary to assume the role as a regular employee.

Plaintiff alleges that somewhere between his 60–90th day while working for Sun Chemical, he complained of racial discrimination and that this resulted in him being subjected to more rigorous supervision and ultimately his unlawful termination. As noted, Plaintiff initially brought three claims seeking relief under Title VII based on race discrimination, maintenance of a hostile work environment, and retaliation. Doc. 1, PageID 5–6. However, after Sun Chemical filed its motion for summary judgment, Jones abandoned two of those claims—for race discrimination and hostile work environment, Doc. 31, PageID 1150. As such, Plaintiff's only remaining claim seeks monetary relief under Title VII for retaliation for engaging in protected activities.[1] Doc. 1, PageID 5 (Count 2).

---

[1] Plaintiff brings an equivalent state law retaliation claim pursuant to Ohio Rev. Code § 4112. Under the law of this Circuit, the same evidentiary framework applies to discrimination and retaliation claims brought under Title VII and state law. *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992). The Court will therefore apply its analysis to Plaintiff's equivalent state law claim.

## II. THE PARTIES' STIPULATED FACTS

In compliance with this Court's Standing Order Governing Civil Cases, Sun Chemical filed a document entitled "Proposed Undisputed Facts" ("PUF") (Doc. 29). *See* Standing Order Governing Civil Cases (II)(F)(6)(b). Plaintiff filed a response to Sun Chemical's PUF (as required by the Standing Order), so the Court draws the factual background for this opinion largely from those two pleadings. *Compare* Doc. 28 *with* Doc. 31-2.

The Parties agree on the following facts:

1. Sun Chemical's entire Amelia, Ohio plant was run by John Rozier, Sun Chemical's "Regional Operations Manager." Rozier is an African American male. Doc. 31-2, ¶ 2–3

2. Rick Krieger, Sun Chemical's "Plant Manager," reported to Rozier. Krieger is a Caucasian male. *Id.* ¶ 4, 8.

3. Plaintiff and Krieger had a friendly relationship before Plaintiff was hired. Krieger interviewed and hired Plaintiff. *Id.* ¶ 7, 9.

4. Like all new-hires, Plaintiff's employment began with a 90-day probationary, evaluation period. Plaintiff worked as an entry-level production technician mixing chemicals. Plaintiff understood that he was expected to learn the job during the probationary period and that he would be evaluated every 30 days to assess progress and performance. *Id.* ¶ 12–13.

5. Plaintiff understood that probationary employees who did not perform satisfactorily would not be brought on as a regular employee. Probationary employees are "closely scrutinized" so Sun Chemical can determine which

candidates demonstrate the skills to perform the role "without the guidance and training that occurs during the probationary period." *Id.* ¶ 14–16.

6. Plaintiff was trained by and spent much of his time with Gary Pringle, who helps train new production technicians. Pringle is a Caucasian male. *Id.* ¶ 17–18.

7. Steve Hicks was Plaintiff's immediate supervisor. Hicks is a Caucasian male. *Id.* ¶ 20.

8. Hicks, with contributions from Pringle, completed Plaintiff's first 30-day evaluation, which was "satisfactory." *Id.* ¶ 20–22.

9. Just before Plaintiff's 60-day evaluation, Krieger issued Plaintiff an official counseling for having accumulated eight "attendance" and "observance of work hours" violations. The violations included tardiness, leaving work early, and missing an entire shift. *Id.* ¶ 24–26.

10. Despite the concerns about Plaintiff's "attendance" and "observance of work hours," like the first 30-day period, Hicks again rated Plaintiff overall "satisfactory" for his 60-day evaluation. *Id.* ¶ 26.

11. Between Plaintiff's 60–90th day on the job as a probationary employee, Plaintiff's supervisors and trainer documented that Jones was missing from his work area and found in his vehicle; that Jones was nonresponsive to pages; that Jones was using his cell phone excessively; that Jones was "extremely messy" with aspects of work; and that Jones took excessive breaks and lunches. *Id.* ¶ 32.

12. Plaintiff knew by then (the period between his 60-90th day of employment as a probationary employee) that his supervisors had serious concerns with his performance. *Id.* ¶ 33.

13. Krieger issued Plaintiff's 90–day evaluation and noted that Plaintiff's performance raised concerns about his ability to make good decisions and produce acceptable quantities of work as a regular, non-probationary employee. *Id.* ¶ 34–35.

14. Because of these performance concerns, Rozier extended Plaintiff's probationary period by an additional 30 days to give Plaintiff another opportunity to prove he could perform the role. *Id.* ¶ 40.

15. Within the 30 days added to his 90-day probationary period, Plaintiff drove a forklift into a garage door causing damage. Plaintiff admits that he was not operating the forklift in accordance with his training. *Id.* ¶ 43–44, 46.

## III. STANDARD OF REVIEW

As the party seeking summary judgment, Sun Chemical "'bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

But the non-moving party cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*,

974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (*i.e.*, supported by evidence) and go to a "material fact" (*i.e.*, a fact that could matter to the outcome).

After reviewing the evidence before it, the Court must determine whether there is some "sufficient disagreement" about material facts that necessitates submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That is, "[i]n arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

IV. **LAW AND ANALYSIS**

    A. **Retaliation**

In addressing Plaintiff's only remaining claim—retaliation, the Court is reminded that Title VII prohibits retaliatory actions against employees who oppose, report, or participate in investigations involving conduct that violates Title VII. *See* 42 U.S.C. § 2000e-3(a). To demonstrate a claim of retaliation in violation of Title VII, a plaintiff can either present direct evidence or use the *McDonnell Douglas* framework to establish a *prima facie* case through circumstantial evidence. *Imwalle v. Reliance Med. Prods. Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Because Plaintiff has neither alleged nor offered direct evidence of retaliation, the Court must analyze his claim of retaliation by his former employer under the *McDonnell Douglas* framework.

6

Under the *McDonnell Douglas* framework, Plaintiff must prove retaliation by making four showings: (1) that he engaged in activity protected under Title VII; (2) that Sun Chemical, his former employer, knew that Plaintiff exercised those protected rights; (3) that an adverse employment action was subsequently taken against him; and (4) that Plaintiff's protected activity was the but-for cause of the adverse employment action. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020). If successful, Sun Chemical would then have the burden of articulating a legitimate nondiscriminatory reason for the adverse employment action. *Gibson v. City of Louisville*, 336 F.3d 511, 513 (6th Cir. 2003). Finally, if Sun Chemical can articulate a nondiscriminatory reason, the burden shifts back to Plaintiff ultimately to show that this nondiscriminatory reason is in fact pretextual, and that unlawful retaliation was the real reason for the adverse action. *Id.*

This somewhat confusing burden-shifting framework raises concerns that litigants and courts may struggle to differentiate between a plaintiff's intermediate and ultimate burdens. However, it bears emphasizing that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The *McDonnell Douglas* framework is intended "to bring the litigants and the court expeditiously and fairly to this ultimate question." *Id*. Ultimately, Plaintiff will have to "establish that. . . [his] protected activity was the but-for cause of the alleged adverse action by [Sun Chemical.]" *U. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). To be certain, Plaintiff must put forth sufficient facts demonstrating that "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions" of Sun Chemical. *Id.*

7

As it relates to the remaining claim being considered, the Court notes generally that the parties do not dispute that Plaintiff can establish the first three elements. There is no dispute, for example, that Jones engaged in activity protected under Title VII by complaining to Sun Chemical management about alleged racial discrimination; that Sun Chemical knew about Jones's claims; and that an adverse employment action subsequently befell Jones, *vis-a-vis*, he was terminated as a probationary employee, according to him, for lodging a discrimination complaint.[2] As for the fourth element, the Parties strenuously disagree over

---

[2] The Court considered Defendant's "it's very much disputed" whether Plaintiff engaged in protected activity argument. Doc. 27, PageID 1112. While Defendant's argument is not entirely meritless, the Court finds that it does not prevail here. "To come within the protection of Title VII, [Plaintiff] must establish that [he] challenged an employment practice that [he] reasonably believed was unlawful." *Harrison v. Valley Packaging Corp.*, No. 1:20-CV-00004, 2022 WL 103873, at *2 (M.D. Tenn. Apr. 6, 2022) (quoting *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 645 (6th Cir. 2015)). The Sixth Circuit has continued to broadly interpret challenging an unlawful employment practice or a "protected activity." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009). Protected activity has included "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). That said, our Circuit has clarified that merely talking to a supervisor or manager does not rise to the level of engaging in a protected activity. *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (finding that the plaintiff did not engage in protected activity because his statements to his manager were too ambiguous to amount to opposition of an unlawful employment practice); *see also Masaebi v. Arby's Corp.*, No. 2:19-CV-5271, 2020 WL 1275724, at *6 (S.D. Ohio Mar. 17, 2020) (holding discussing a language barrier with a supervisor is not taking an overt stand against discriminatory activity). Plaintiff testified that he had several conversations with Hicks regarding issues of suspected "sabotage" with "his" tools and timecard. Doc. 22, PageID 343. Plaintiff also met with Krieger and Rozier sometimes regarding the same. *Id.* at PageID 425. Plaintiff states that during one of those discussions, he also informed Hicks about a Caucasian coworker who complained aloud that his "daughter was dating a fucking nigger," and kept using *the* word throughout his rant. Doc. 22, PageID 319. Plaintiff also testified that his brief tenure with Defendant was during President Trump's time in office after President Obama. *Id.* at PageID 344. Plaintiff stated that sometimes there were lunchroom discussions regarding race and politics that, at times, involved racial jokes, which made it uncomfortable for him as the only Black man in the group. *Id.* at PageID 344, 426. Plaintiff testified that he never heard any manager or supervisor say anything about Trump or Obama or make any jokes about race. Doc. 22, PageID 424–25. Yet, Plaintiff testified that "the conversations were getting out of control" and when he "sat down with people like Krieger, [they] had a conversation about it." Individually, Plaintiff's complaints could reasonably be viewed as general workplace grievances, not oppositions to an unlawful employment practice. But when these comments are considered together, their combined effect becomes more significant, and supports an inference that Plaintiff was attempting to communicate that he was the target of discrimination in what he believed to be a racially toxic environment. Given the Circuit's generally inclusive and broad interpretation of what constitutes opposition to unlawful practices, it is likely that Plaintiff's actions would seem to engage in "protected activity," *i.e.*, challenging practices "he reasonably believed [were] unlawful." *Yazdian*, 793 F.3d at 645 (emphasis added). Therefore, finally, the Court returns to its ultimate obligation at this stage: to view the evidence in the light most favorable to Plaintiff to determine whether there is a genuine issue as to any material fact. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th

whether Plaintiff's alleged protected activity was the "but-for" cause of his termination. Doc. 31, PageID 1155; Doc. 32, PageID 1198. Plaintiff contends that temporal proximity alone—*i.e.*, the relatively short amount of time that elapsed between when his protected activity and the adverse employment occurred—suffices as proof of causation so as to enable Plaintiff's retaliation claim to survive summary judgment. Doc. 31, PageID 1155–56. Sun Chemical disagrees. Doc. 32, PageID 1199.

### i. Temporal proximity alone is normally insufficient to establish causation.

To understand the role of timing between when a plaintiff engages in protected activities and when adverse employment actions occur, and whether this alone can establish a *prima facie* case of retaliation, the Court finds the Sixth Circuit's decision in *Mickey v. Zeidler Tool and Die Co.*, 16 F.3d 516, 525 (6th Cir. 2008), to be instructive. There, the Sixth Circuit held that "[w]here an adverse employment action occurs very close in time after an employer learns of protected activity, such temporal proximity between events is significant enough to constitute evidence of causal connection" for purposes of establishing a *prima facie* case. As relevant here, however, Sun Chemical argues that Plaintiff cannot rely on *Mickey v. Zeidler Tool and Die Co.* because that case predated the mandate established by the United States Supreme Court in *Nassar*, which imposed a far more stringent "but-for" causation standard on employees claiming retaliation.[3] Doc. 32, PageID 1199. In *Nassar*, the Supreme Court held that "Title VII retaliation claims must be proven according to traditional principles of but-for

---

Cir. 2008). The broader context supports the argument that when Plaintiff, as the only Black man in the group, injected the coworker's racial slur into a discussion with Hicks about repeated issues with "only his" materials, he "engaged in protected activity." *Johnson*, 215 F.3d at 579.

[3] Sun Chemical cites *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 174 (2009) for its proposition of the "but-for" causation standard. Doc. 32, PageID 1199.

9

causation, not the lessened causation test stated in § 2000e–2(m)." 570 U.S. at 360. Under this "more demanding" causation standard, plaintiffs in these cases are required to offer proof that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. Despite the clear mandate expressed in *Nassar*, Plaintiff argues correctly that the Sixth Circuit has yet to overrule *Mickey v. Zeidler Tool and Die Co*. and has in fact upheld that decision post-*Nassar*. Doc. 31, PageID 1157.

In an effort to urge the Court to deny Sun Chemical's motion for summary judgment, Plaintiff cites several cases in support of his argument that his reliance exclusively on temporal proximity to establish but-for causation suffices at the preliminary stages for making out a *prima facie* case of retaliation. Plaintiff points the Court to *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (holding that the constructive discharge of Montell, the plaintiff in that case, one day after her complaint of sexual harassment was enough to establish causation); *Herrera v. Churchill McGee, LLC,* 545 Fed.Appx. 499, 501 (6th Cir. 2013) (holding that plaintiff's termination one month after he complained of racial discrimination to his employer was enough to establish causation); and *Amos v. McNairy Cnty.,* 622 Fed. Appx. 529, 538 (6th Cir. 2015) (unpublished) (holding that plaintiff's suspension and subsequent termination seventeen days after the EEOC investigated his discrimination charge were enough to establish causation). Doc. 31, PageID 1156–57.

Plaintiff is correct in suggesting that the Sixth Circuit's *Montell* decision offers further insight into the disposition of this case. In *Montell*, the Court of Appeals found that the plaintiff's allegation of a constructive discharge that occurred *one* day after she complained of sexual harassment was enough to establish causation. In so doing the Court explained that:

> *Mickey* [*v. Zeidler Tool and Die Co.*] reconciled two lines of cases, some of which say that temporal proximity alone is not enough, and some that say temporal

10

> proximity alone can be enough and explaining why the two strands diverged. Cases that state temporal proximity alone is not enough to establish causation also note that combining temporal proximity with other evidence of retaliatory conduct is enough to establish a causal connection. *See, e.g., Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) (noting that "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim," but elaborating further that "[t]here are, however, circumstances where temporal proximity, considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection.") (internal quotation marks and citations omitted.)

*Montell*, 757 F.3d at 505.

*Montell* stands for the proposition that temporal proximity alone may be sufficient to establish causation at the *prima facie* stage, but only in the rarest of cases. In other words, plaintiffs alleging retaliation under Title VII and relying on temporal proximity to establish causation must ordinarily support those allegations with other evidence of retaliatory conduct. *See Bush v. ProMedica Toledo Hosp., Inc.*, No. 21-3444, 2022 WL 221639, at *4 (6th Cir. Jan. 26, 2022) (quoting *Kenney*, 965 F.3d at 449) ("While we allow for exceptions to this rule, they '**are rare, even in instances involving relatively short time periods**.'") (emphasis added.

Given the emerging view from the Sixth Circuit on this subject, Plaintiff cannot find refuge in *Montell*, *Herrera*, *Amos*, or any other case cited[4] to support the proposition that temporal proximity, standing alone, can establish a causal connection for a retaliation claim. Unlike Plaintiff here, the *Montell* court identified temporal proximity *in addition to* other evidence proffered by the plaintiff in the early stages of that case to support "but-for" causation. 757 F.3d at 506 (emphasis added). Moreover, and most detrimental to Plaintiff's

---

[4] For the reasons stated, Plaintiff's reliance on *Springfield v. Akron Metro. Hous. Auth.*, 389 F.3d555, 563 (6th Cir. 2004) is also misplaced.

11

case, unlike the *Montell*, *Herrera*, and *Amos* plaintiffs, Jones cannot verify *when* he allegedly engaged in protected conduct to establish a timeline on which the Court can rely.

As earlier noted, Jones contends that he complained of racial discrimination "sometime after the sixty-day evaluation and before the ninety-day evaluation." Doc. 31, PageID 1152. In support of this contention, Plaintiff cites portions of his deposition testimony. *Id*. But none of the parts of the deposition cited demonstrate exactly when the allegedly retaliatory activity occurred.[5] When asked during his deposition on what date specifically, he complained of racial discrimination, Plaintiff stated "**I can't remember a specific day [or] time, but it was within my tenure there [at the Sun Chemical Amelia plant]**." Doc. 22, PageID 415 (emphasis added). Despite Plaintiff's inability to articulate when he allegedly complained of experiencing racial discrimination to his supervisors at Sun Chemical, he maintains that "there is no real factual dispute" that he was terminated within 60 days of his protected conduct. Doc. 31, PageID 1156. The Court disagrees.

Plaintiff concedes that Sun Chemical's policy subjected all new employees to a "closely scrutinized probationary period" for the first 90 days, and that all probationary employees are evaluated at the 30, 60, and 90-day intervals. *Compare* Doc 28, PageID 1136 ¶ 14 *with* Doc. 31-2, PageID 1183 ¶ 14. According to Sun Chemical, after every 30-day interval the company evaluates each probationary employee's performance and determines who will be elevated to regular full-time, *i.e.*, non-probationary, employee status. *Id.* Plaintiff also concedes that he understood that Sun Chemical established this standard procedure to

---

[5] Plaintiff cites to Doc. 22, PageID 259–260, 318, 343, 372–77. Yet the cited portions of the record only show *what* was allegedly discussed not *when* it occurred. Moreover, Plaintiff's testimony at 259–260 relates to conduct that allegedly occurred during Plaintiff's time with his **previous** employer, **not** his employment with Sun Chemical. Consequently, the cited testimony injects more doubt, not clarity, into the Court's mind.

determine which new hires could perform the role "without the guidance and training that occurs during the probationary period." *Id.* ¶ 13, 14. The major impediment to Plaintiff's ability to claim "but-for" causation at this *prima facie* stage of the case stems from his admission that undisputed evidence reveals, that he committed multiple workplace violations within the "closely scrutinized" probation period *after* he allegedly complained of discrimination.

Regardless of when he made the complaints, Plaintiff admits that during his final evaluation period, he improperly operated a forklift, causing it to crash into a garage door and resulting in damage, (Doc. 22, PageID 481–82[6]); that he had back-to-back attendance violations after having already received a "Record of Counseling" for attendance violations (*id.* at PageID 486–88); and that he miscut a large batch of pigment resulting in 2,000 pounds of waste (*id.* at PageID 517–18). Any one of these miscues or workplace infractions—and certainly the combination of all of them—could have been justification for Sun Chemical to terminate any employee during the closely scrutinized probationary period, including Jones.[7]

These admissions by Plaintiff also make it highly improbable that his claim of retaliatory discrimination was the root cause of his termination, regardless of the timing of when he allegedly lodged that complaint. Aside from the timing of his termination, Plaintiff has proffered no other evidence of retaliatory behavior on the part of Sun Chemical to support

---

[6] Plaintiff sought to minimize the severity of the forklift crash by implying that his trainer, Pringle, was never disciplined for the same conduct. Doc. 31, PageID 1161. Not so. Pringle does admit he had minor incidents involving the forklift. Doc. 25, PageID 986–87. At the same time, Pringle testified that he was *always* counseled, and even once suspended, for them. *Id.* And there is no record evidence that Pringle was a probationary employee subject to heightened scrutiny like Plaintiff when the accidents occurred.

[7] The Court notes that Defendant extended Plaintiff's probationary period by 30 days, beyond the standard 90, to give Plaintiff another opportunity to prove he could perform the role. Doc. 21, PageID 129. Therefore, Plaintiff's admitted violations occurred between his 90–120th day. *Id.*

13

the "but-for" causation needed to establish a *prima facie* case. *Nassar*, 570 U.S. at 360. Indeed, Plaintiff's testimony that Sun Chemical expressed serious concerns over his work performance between his 60–90th day, and that he remained as a probationary employee for an additional 30 days (instead of being elevated to full-time status) can only mean that he well understood going into that extended probation period that his job was on the line if he didn't improve upon his previous performance. Doc. 22, PageID 464, 469.

The Court notes also that even though Plaintiff claims that he complained of racial discrimination during the 60-90th day of probationary status, his admission that he received a "Record of Counseling" just *before* his 60-day evaluation for **eight** "attendance" and "observance of work hours" violations within his first two months of employment only undermine his claim of retaliation. Doc. 31-2, PageID 1183 ¶ 24. The eight violations for which he was counseled included Jones clocking in late for work multiple times, leaving work early, and missing an entire shift. *Id.* Plaintiff's actions do not make for added success by a regular full-time employee, let alone one newly hired seeking to make a favorable impression on his supervisors and wanting to move from probationary to full-time employment status. Doc. 22-13, PageID 700; Doc. 27, PageID 1097.

Furthermore, Plaintiff also concedes that within the 30 days added to his 90-day probationary period, he operated a forklift, in his own words, "unsafely" when he drove it into and damaged Sun Chemical's garage door. Doc. 22, PageID 484, 486–88. And Jones concedes that his "unsafe" operation of the forklift violated the training given to him by Sun Chemical. *Id.* Additionally, Plaintiff committed two more "attendance" and "observance of work hours" violations within days of each other during his extended 30-day evaluation period—also actions that did nothing to improve Plaintiff's odds of being hired full-time in

14

the eyes of his supervisors or, more importantly, to lend credence to the notion that Jones was fired in retaliation for complaining about alleged racial discrimination. *Id.* at PageID 486–88. Under the circumstances, even viewing the facts most favorably for Plaintiff, the Court finds that this is not one of the rare cases where Jones can rely on temporal proximity alone to establish a *prima facie* case of retaliation under Title VII for engaging in protected activities.

Said plainly, even before any complaint(s) of discrimination, Plaintiff failed miserably to demonstrate that he possessed the skills and work habits needed "to perform the role without the guidance and training that occurs during the probationary period." Doc. 31-2, PageID 1183 ¶ 14–16. If anything, by extending Plaintiff's status as a probationary employee for an additional 30 days, Sun Chemical gave Jones far more opportunities to succeed than it normally does with other new hires who have only 90 days to prove themselves worthy of full-time employment. Sun Chemical has clearly shown that not only has Plaintiff failed to establish causation, but it also had more than enough justification for terminating him, given the accumulation of workplace violations and miscues demonstrating Plaintiff's poor performance throughout his probationary period. To hold otherwise would allow Plaintiff's claim of retaliation to survive summary judgment based on the thinnest record of immaterial facts and innuendos offered to create a veneer of discrimination—when informed evidence and well-established case law suggest that a contrary result should obtain.

Indeed, as the Supreme Court explained: "[A]n employee who knows that he or she is about to be fired for poor performance, . . . [t]o forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation." *Nassar*, 570 U.S. at 358–59 ; *see also Wheelwright v. Clairol, Inc.*, 770 F. Supp. 396,

401 (S.D. Ohio 1991) ("[W]e find that the timing of the plaintiff's discharge alone does not establish a causal connection, where the plaintiff was repeatedly warned about his poor performance, placed on a five-week probationary period, and told he would be discharged if his performance did not improve.").

For the reasons stated, the Court **GRANTS** summary judgment in favor of Sun Chemical related to Plaintiff's claim of retaliation based on protected activities. [8]

### ii.     Pretext

The record in this case also suggests an alternate ground for sustaining the motion for summary judgment in favor of Sun Chemical. Even if Plaintiff could produce evidence supporting all four elements needed to make out a *prima facie* case of retaliation (including causation), his claim must still fail because he has not established a genuine issue of material fact over pretext. Here, Sun Chemical has articulated a legitimate, non-discriminatory reason for Plaintiff's termination: "documented policy violations, poor work performance, and failure to improve during the probationary period." Doc. 27, PageID 1113; Doc. 21, PageID 149–151.

Under the *McDonald Douglass* framework, the burden then shifts back to Plaintiff who must establish that the proffered reason is pretextual by creating a factual predicate that one of three things obtains: "(1) [that the proffered reason] has no basis in fact; (2) [that the proffered reason] did not actually motivate the adverse employment action; or (3) [that the proffered reason] was insufficient to warrant the adverse action." *Ladd v. Grand Trunk W. R.R.,*

---

[8] The Court's review of the record revealed only one conversation between Plaintiff and Hicks to which a date could be affixed, which purports to amplify the Court's hesitation that the complained of discrimination occurred when Plaintiff suggests. *See* Doc. 24-5, PageID 955–56.

*Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). For reasons previously discussed, Jones is foreclosed from arguing that Sun Chemical's decision is irrational or unsupported factually. On this, it is less than accurate for Jones to claim that his repeated workplace infractions and miscues did not motivate or provide a legitimate justification for Sun Chemical's decision to terminate him.[9] *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds); Doc. 22, PageID 481–82, 86–88, 517–18.

At bottom, Sun Chemical has not only articulated legitimate, nondiscriminatory reasons for Plaintiff's termination, they have done so by using Plaintiff's own admissions. In so doing, Plaintiff has failed to create a genuine issue of material fact related to pretext. There is no factual dispute that Plaintiff committed multiple violations of workplace rules and one or more negligent acts during his extended evaluation period. By his own hand, Jones made

---

[9] The third showing, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to what the "employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084. As stated above, Plaintiff intentionally abandoned his race discrimination claim. Doc. 31, PageID 1150; *see supra,* section III.A. Therefore, Plaintiff abandoned his opportunity to pursue a claim **solely** because he was "treated less favorably than a similarly situated individual outside his **protected** class," *i.e.*, his race. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002). That is, Plaintiff is trying to demonstrate that he faced unfair treatment compared to others in his workplace. Even still, it's not enough for him to merely claim that other individuals who engaged in similar behavior weren't fired *because* they were Caucasian. To make a valid comparison, he needs to look at other probationary employees—**those who were still within their trial period at the company**—regardless of their race, national origin, or gender. Plaintiff's issue is that he hasn't provided evidence that other probationary employees committed the same or very similar actions as he did and yet were not terminated. This lack of evidence is fatal to his third element argument that his firing was retaliatory. *Manzer*, 29 F.3d at 1084. Again, Plaintiff only vaguely references his Caucasian trainer, Pringle, who, in any event, testified that he was *always* counseled, and even once suspended because his infractions, like Plaintiff's, "were close together" in time. Doc. 22, PageID 436–37; Doc. 25, PageID 986–87. More critically, though, for Plaintiff, unlike himself, there is no evidence that Pringle was a probationary employee subject to heightened (let alone doubly heightened) scrutiny when his accident occurred. Doc. 25, PageID 986–87. For clarity, had Plaintiff continued to pursue a discrimination claim, his reliance on Pringle would have been insufficient because comparators must be similarly situated to a plaintiff "**in all of the relevant respects**" to an employee of a different race who was treated better. *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (emphasis added). Relevant factors can include whether the employees: "(1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) **were subject to the same standards**." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992) (emphasis added).

himself the subject of doubly increased scrutiny. These violations included issues for which Jones had previously been counseled, all of which occurred *before* his alleged complaints about racial discrimination at Sun Chemical. Under these circumstances, it can hardly be said that the reasons articulated by Sun Chemical for terminating Jones were a pretext for retaliation.[10] Accordingly, this matter does not present "a sufficient disagreement" that necessitates its submission to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).[11]

---

[10] The Court notes that Plaintiff moved to strike Defendant's second declaration. Doc. 35. In light of the above, Plaintiff's motion will be denied as moot.

[11] For the avoidance of doubt, the Court notes Plaintiff's reference to 29 C.F.R. § 1602.14 for his argument that Sun Chemical failed to preserve the "batch notes" on which it partially relied for its termination decision. Doc. 31-2, PageID 1185–86. Batch notes, or "shift notes" are the "employee's notes documenting what they completed during their shift." Doc. 24, PageID 911–12. Plaintiff argues that because his batch notes were destroyed, "they cannot be relied upon to substantiate allegations about [Plaintiff's] performance." Doc. 31-2, PageID 1185–86; Doc. 31, PageID 1160. Again, Plaintiff's argument is confusing and misguided. First, it implies that Sun Chemical did not have the right to rely on the batch notes when it terminated Plaintiff, which does not make sense. In other words, the fact that Plaintiff cannot presently confirm the information does not affect whether Sun Chemical's reliance on the notes was permissible at the time of its decision. Plaintiff misapplies the law about Rozier's testimony that he partially relied on Plaintiff's batch notes before terminating him. Remember, Federal Rule of Evidence 602 sets forth the personal knowledge requirement for a witness to testify to a matter. Sworn deposition testimony is considered to be an affidavit pursuant to Federal Rule of Civil Procedure 56(c) and may be used against a party on summary judgment as long as the proffered testimony was made on personal knowledge. *Liberty Mut. Fire Ins. Co. v. Ivex Protective Packaging, Inc.,* No. 3:13-CV-175, 2014 WL 6687150, at *5 (S.D. Ohio Nov. 26, 2014) (citing *Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001)). Personal knowledge may be inferred in some cases from the content of the statements or context of the affidavit, particularly when a close relationship exists between the affiant, like Mr. Rozier, and the subject. *See Fambrough v. Wal–Mart Stores, Inc.*, 611 F. App'x 322, 330 (6th Cir. 2015) (recognizing prior holdings that "'[c]orporate officers are considered to have personal knowledge of the acts of their corporations and an affidavit setting forth those facts is sufficient for summary judgment.'") (quoting *AGI Realty Serv. Grp., Inc. v Red Robin Intern, Inc.*, 81 F.3d 160 (6th Cir. 1996)). Secondly, Rozier explicitly testified that he relied on multiple forms of evidence, not exclusively batch notes, including his own observations and the direct observations of Plaintiff's trainer and superiors, which included persons Plaintiff does not allege were biased against him. Doc. 21, PageID 140–41, 149–50. Finally, to the extent that batch notes fall within the scope of documents sought to be preserved under 29 C.F.R. § 1602.14 (of which the Court is dubious), Sun Chemical's preservation obligations extended only to documents **currently within its possession** until Plaintiff's Title VII dispute was resolved. That is, if Sun Chemical had Plaintiff's batch notes when the Title VII suit was brought, it could not then destroy them, **even if** Sun Chemical had them for more than a year at that point. In short, it's a spoliation concern. Plaintiff, with a sleight of hand, ignores the provision's explicit language. Indeed, "in the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of **one year from the date of termination**." 29 C.F.R. § 1602.14. It's undisputed that Plaintiff was terminated in August 2019. Doc. 31-2, PageID 1183 at ¶ 10. It's also undisputed that Plaintiff filed his action against Sun Chemical on November 30, 2020, *i.e.*, more than a year from his termination. Doc. 1. To be sure, even Plaintiff's EEOC "right to sue" determination was

## V.    CONCLUSION

For the reasons stated, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 27). The Court **ORDERS** the clerk to **ENTER JUDGMENT** in Defendant's favor and **TERMINATE** this matter from the docket.

**IT IS SO ORDERED.**

October 9, 2024

                                          Jeffery P. Hopkins
                                          United States District Judge

---

not sent to Sun Chemical until September 1, 2020, also more than a year after termination. Doc. 1-2. Thus, it's not a "genuine dispute of material fact" that Sun Chemical could not produce Plaintiff's batch notes, especially when its standard practice was to destroy said notes every 30 days. Doc. 24, PageID 946. Though, for clarity, if batch notes do fall within the scope of documents to be preserved by 29 C.F.R. § 1602.14, Sun Chemical's 30-day destruction practice would violate the regulation since "[a]ny personnel or employment record made or kept by an employer… shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later." *Id.* Nonetheless, the Court need not decide on the matter to resolve Plaintiff's issue.